**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BENJAMIN C. GONGON,** | : | **CIVIL ACTION** |
|     **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   22-cv-384** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
|     **Defendant.** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                    **June 9, 2023**

Plaintiff Benjamin C. Gongon brought this action seeking review of the Acting Commissioner of Social Security Administration's decision denying his claim for Social Security Disability Insurance (SSDI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 10) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.

## I.        PROCEDURAL HISTORY

Plaintiff protectively filed for SSDI, alleging disability since January 1, 2019, due to Crohn's disease, chronic pain, depression, anxiety, acid reflux and nausea.  (R. 210-11).  Plaintiff's application was denied at the initial level and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 77-106, 110-14, 120).  Plaintiff, represented by counsel, and a vocational expert testified at the March 25, 2021 administrative hearing.  (R. 41-76).  On June 29, 2021, the ALJ issued a decision unfavorable to Plaintiff.  (R. 14-39).  Plaintiff appealed the ALJ's decision, but the Appeals Council denied

Plaintiff's request for review on April 8, 2021, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-6, 182-84).

On January 28, 2022, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C) on February 1, 2022. (Compl., ECF No. 1; Consent Order, ECF No. 4).  On June 9, 2022, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 10).  The Commissioner filed a Response on July 11, 2022, and on July 25, 2022, Plaintiff filed a reply.  (Resp., ECF No. 11; Reply, ECF No. 12).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on November 6, 1998, and was 20 years old on the alleged disability onset date.  (R. 228).  He completed eleventh grade.  (R. 211).  Plaintiff previously worked as a laborer and delivery person in food service.  (*Id.*).

### A.    Medical Evidence

#### 1.    Physical

On December 16, 2015, Plaintiff presented to the Children's Hospital of Philadelphia with a one-year history of abdominal pain, worse over the prior few weeks.  (R. 673).  The pain was "functional in nature," but Plaintiff had lost 30 pounds throughout the year because eating had worsened the pain, leading to a poor appetite.  (R. 675).  Following a physical examination, the treating physician noted that "his symptoms are most concerning for inflammatory bowel disease."  (R. 676).

On April 28, 2017, Plaintiff went to the Chestnut Hill Hospital emergency room (ER) after not feeling well the prior two days with nausea, abdominal pain and vomiting.  (R. 1038, 1040).  His Crohn's disease was described as "poorly controlled," although his examination results were largely normal.  (R. 1040-42).  He was described as "stable" and discharged within a few hours.  (R. 1043).

On August 15, 2019, Plaintiff visited Brandon Eberts, PA, at Main Line Gastroenterology Associates.  (R. 531-35).  He had lost 13 pounds since April 2019 due to lost appetite caused by intermittent nausea and acid reflux.  (R. 405).  He reported abdominal pain, which was "complicated by possible overlap IBS/visceral hypersensitivity."  (R. 402).  Mr. Eberts noted that Plaintiff's depression was "[c]ertainly [a] contributing factor to chronic pain and associated issues with overlap anxiety, unclear how much related to marijuana use."  (R. 532).  However, he further noted that the medical marijuana improved Plaintiff's pain and allowed him to sleep better.  (R. 534).  Plaintiff was directed to continue with Remicade and Pantoprazole and start Zantac for his abdominal pain.  (R. 533).

Plaintiff returned to the Chestnut Hill Hospital ER on November 22, 2019, for abdominal pain and cramping stemming from his Crohn's disease, tingling in his extremities, lightheadedness and a nosebleed.  (R. 985-86).  He was "actively vomiting in triage."  (R. 985).  He stated that his abdominal pain had started a few weeks ago and worsened on the date of the hospital visit.  (Id.).  Patient was given Bentyl and Haldol and discharged after he was noted to be "hemodynamically stable and with a benign abdomen."  (R. 986).

On January 7, 2020, Plaintiff contacted Dr. Kaufman's office about anal fissures lasting the past two weeks without relief from a bidet and lidocaine cream.  (R. 636).  Dr. Kaufman prescribed Rectiv ointment.  (Id.).  Bloodwork two weeks later was normal other than minimally elevated sugar levels.  (R. 634).

On March 11, 2020, Plaintiff saw Adam Kaufman, M.D. for his Crohn's disease and chronic pain. (R. 508). Plaintiff reported "ups/downs" with his Remicade course and Dr. Kaufman noted that Plaintiff had rescheduled an August 2019 infusion to the following month. (*Id.*). The progress note indicates that Plaintiff was scheduled to receive infusions every six weeks. (*Id.*). Plaintiff described his gastrointestinal symptoms as "alright" and his abdominal pain as a one or two on a one-to-ten scale. (*Id.*). His bowel habits were "stable" albeit "with intermittent diarrhea that resolves on its own." (*Id.*). He had no urgency and was able to distinguish between having to pass stool and gas. (*Id.*). Plaintiff had intermittent acid reflux brought on by not eating for long periods. (*Id.*). His physical examination was generally normal, although with minimal diffuse abdominal tenderness without localization. (R. 510). Dr. Kaufman kept Plaintiff on an every-six-weeks schedule of Remicade. (R. 511).

On August 25, 2020, State agency medical consultant Toni Jo Parmelee, D.O., opined that Plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds; in an eight-hour workday, stand and/or walk for two hours and sit for six hours; push and pull without additional limitations; occasionally climb ramps and stairs, balance, stoop and crouch; but never climb ladders, ropes and scaffolds, kneel, or crawl. (R. 96). She further determined that Plaintiff must avoid concentrated exposure to humidity, vibrations, hazards, extreme heat and cold, and respiratory irritants. (R. 97).

On September 17, 2020, Plaintiff went to the Chestnut Hill Hospital ER with cramping abdominal pain, nausea and "multiple episodes of vomiting." (R. 976). He had diffuse tenderness to touch but no abdominal guarding or rebound tenderness with a soft abdomen and normal bowel sounds. (R. 979). Plaintiff again improved with Haldol and was discharged as hemodynamically stable and with no fever. (R. 981).

4

Two days later, Plaintiff returned to the Chestnut Hill Hospital ER for "intermittent diffuse abdominal pain," cramping and vomiting mucus. (R. 968). Physical examination results were largely normal, although laboratory testing showed small amounts of ketones in his urine. (R. 968, 972-73). His symptoms were described as not consistent "w/crohn's flare—no diarrhea or blood" and more consistent with "cyclic vomiting." (R. 973). Plaintiff was instructed to cease his marijuana usage, and he agreed. (*Id.*). He was discharged after he responded well to Haldol. (*Id.*).

On December 10, 2020, Plaintiff went to the Chestnut Hill Hospital ER for nausea and vomiting last for the past day. (R. 960). Physical examination and laboratory results were generally normal. (R. 961). Plaintiff again improved with Haldol and was discharged as afebrile and hemodynamically stable. (R. 965).

Plaintiff had an annual checkup on February 5, 2021, conducted by Michael Hirsch, M.D. (R. 956). The physical examination results were normal, including as to Plaintiff's abdomen. (R. 958).

On March 12, 2021, Dr. Kaufman completed a Crohn's & Colitis Medical Source Statement. (R. 662-64). He noted that Plaintiff had been his patient since December 2016, with office visits and frequent treatments, and that Plaintiff had diagnoses of Crohn's disease, chronic pain, depression and anxiety, with a fair prognosis. (R. 662). Plaintiff's symptoms included chronic and bloody diarrhea, anal fissures, nausea, fatigue, mucus in stool, constant and daily pain, and possible weight loss, vomiting, abdominal distension and fistulas. (*Id.*). The symptoms were described as "episodic" with periods of "flares." (*Id.*). Clinical findings included pain upon examination and laboratory testing results. (*Id.*). Dr. Kaufman concluded that Plaintiff needed to take unscheduled restroom breaks lasting 30 to 60 minutes multiple times daily, sometimes within "seconds" of feeling the urge to use the restroom. (R. 663). He opined

5

that Plaintiff would sometimes need to lie down to rest at unpredictable intervals, that he would have good and bad days, and that he would miss work more than four times per month.  (*Id.*).

### 2.     Mental

Plaintiff received psychotherapy from Ameet Ravital, Ph.D., at Mt. Airy Psychotherapy and Wellness between June 10, 2016, and June 10, 2018.  (R. 614-32).  Depression questionnaires completed by Plaintiff on December 2, 2016, and June 10, 2018, indicate "mild-moderate" depression worsening to "moderate/severe."  (R. 615, 618).  Throughout treatment, he often talked about how his physical symptoms contributed to his depression.  (*See, e.g.*, R. 616-17, 619-20, 622).  Plaintiff ultimately discontinued the sessions because he felt that his situation was hopeless and that the therapy was not helping.  (R. 616).

Plaintiff attended group therapy sessions at Sanare Today in West Chester, Pennsylvania, between February and April 2019.  (R. 285-334).  Upon intake, his mental status examination results were normal.  (R. 333).  He expressed a desire "to try something new and try and get better."  (R. 334).  He complained of social withdrawal stemming from his Crohn's disease, a negative outlook, and irritability.  (*Id.*).  Over the course of therapy, Plaintiff reported fluctuating levels of depression, anxiety and sleep difficulties, frequently discussed how his physical pain impacted his sleep habits and mental symptoms, and learned various strategies and techniques to cope with his conditions.  (R. 285-334).  At times he also discussed his relationship with his family and his use of medical marijuana for pain management.  (*Id.*).

On March 29, 2019, Plaintiff visited psychiatrist William C. Jangro, D.O., at Jefferson Psychiatry and Human Behavior Center City in Philadelphia.  (R. 338).  His primary diagnosis was current moderate episode of major depressive disorder without prior episode.  (*Id.*).  Plaintiff reported that his mood had improved "a little" but that he had "been unable to further cut down" on his marijuana use.  (R. 339).  He also reported decreased concentration and sleep

6

disturbances. (*Id.*). His mental status examination was noteworthy for a pale appearance, slow speech and depressed mood, but was otherwise largely normal. (R. 340). He exhibited fair insight and judgment. (*Id.*).

On November 5, 2020, State agency psychological consultant Marci Cloutier, Ph.D., opined that Plaintiff was moderately limited in his ability to carry out detailed instructions, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting, but that he had no other significant limitations. (R. 98-102).

While treating with Psychiatric Associates of Pennsylvania in Wynnewood, Plaintiff completed Anxiety and Depression Inventories at different times. In January 2020, his scores on these questionnaires[1] corresponded to "very low anxiety" and "mild mood disturbance." (R. 470-73). However, by December 2020, his anxiety and depression had both worsened to "moderate" according to questionnaires completed at that time. (R. 604, 606-09).

On February 15, 2021, Amy Poppel, M.S.S., L.C.S.W., wrote a treatment summary narrative to "Release Point" regarding Plaintiff. (R. 601-02). She noted that Plaintiff lost his friends after withdrawing from school due to his Crohn's disease. (R. 601). She explained that home tutoring also failed due to the amount of schoolwork Plaintiff had missed. (*Id.*). She related that Plaintiff then attempted to obtain a high school diploma equivalent at community college, but he ultimately stopped taking classes after missing too much time due to his

[1] These questionnaires are accompanied in the record by handwritten progress notes, apparently from Dr. DelBusto based on a comparison with her known signature. However, the notes are largely illegible. (*See generally* R. 469-98, 561-85).

symptoms.  (R. 601-02).  When asked how Plaintiff could play video games but not complete schoolwork, he responded, "I don't know."  (R. 602).  She described Plaintiff as presenting as angry and depressed and alternating between periods of silence and stories about his family's alleged unfairness toward him.  (R. 601-02).  Family sessions were offered, but Plaintiff declined them because he believed they would not prove successful.  (R. 602).  Ms. Poppel explained that after Plaintiff's psychiatrist put limits on the types and amounts of medical marijuana he would prescribe, Plaintiff became "extremely angry" and terminated the relationship to pursue his preferred medications with another psychiatrist.  (*Id.*).  She noted Plaintiff's intensive outpatient treatment at Solare but that he deployed the skills learned there "somewhat erratically" and that he regularly missed mindfulness classes recommended by Solare.  (*Id.*).  After completing the mindfulness program, he returned to therapy but chose to terminate it because "he didn't feel he was getting much out of [therapy].  He was encouraged to explore his ambivalence about his treatment but declined.  Throughout his work, he struggled to trust this therapist and form a meaningful attachment."  (*Id.*).

Ms. Poppel stated that her patient experienced increased depression; he attended an Intensive Outpatient Program at Sanare Treatment Center and demonstrated some of the skills he learned there, although "somewhat erratically" (R. 601).  He attended the program at Sanare from January 30, 2019, until April 22, 2019.  (R. 285-334).  At his initial appointment, he reported severe longstanding depression because of his chronic pain and the limitations imposed by his severe Crohn's disease.  (R. 333).  Plaintiff reported feeling lonely every day, having a negative outlook on himself, his situation, and his future, worrying, fearing talking with others, and irritability (R. 334).

On October 28, 2020, Elisabeth Gibbings, Psy.D., conducted a consultative mental evaluation of Plaintiff.  (R. 586-99).  Plaintiff reported difficulty falling asleep and concentrating

due to pain and anxiety, losing 30 pounds due to his Crohn's disease, nightmares, depressed mood, hopelessness, past suicidal ideation, irritability, tense feelings, and monthly panic attacks with hyperventilation, agitation, and racing thoughts.  (R. 587).  He denied hallucinations, memory problems or difficulty learning new material.  (*Id.*).  His examination showed a cooperative attitude, adequate social skills, normal appearance and speech, coherent and goal-directed thought processes, a flat affect, clear sensorium, full orientation, mildly impaired attention and concentration, intact memory, average cognitive functioning, fair insight and good judgment.  (R. 588-89).  When asked about his mood, he replied it was "alright, I suppose."  (R. 588).  His reported activities of daily living (ADLs) included personal care, some household chores, shopping, food preparation, volunteering at a museum, birdwatching, making model airplanes, playing video games alone and reading.  (R. 589).  He noted a good relationship with his parents but that he had lost contact with friends.  (*Id.*).  His prognosis was recorded as "fair, given the medical issues."  (R. 590).  Dr. Gibbings further opined that Plaintiff had a mild impairment in carrying out complex instructions, interacting appropriately with supervisors and coworkers, and responding appropriately to usual work situations and changes in a routine work setting and a moderate impairment in interacting with the public, but no other impairments.  (R. 591-92).  She explained that Plaintiff had mildly impaired attention and concentration and an intact memory with "inconsistencies."  (R. 591).

On March 19, 2021, Dr. DelBusto opined that Plaintiff had an unlimited or very good ability to get along with coworkers, interact appropriately with the general public, be aware of and take normal appropriate precautions, adhere to basic standards of neatness and cleanliness, and understand, remember and carry out very short and simple instructions; a limited but satisfactory ability to remember work-like procedures, ask simple questions or request assistance, and to accept instructions and respond appropriately to criticism from supervisors; a

9

seriously limited ability to maintain attention for a two-hour segment; a lack of ability to meet competitive standards in dealing with normal work stress, responding appropriately to changes in a routine work setting, performing at a consistent pace, working in coordination with or proximity to others without being unduly distracted, sustaining an ordinary routine without special supervision, and maintaining regular attendance and being punctual within customary, usually strict tolerances; and no useful or functional ability to make simple work-related decisions and complete a normal workday and workweek without interruptions from psychologically based symptoms.  (R. 1161).  Regarding the reasons Plaintiff would have difficulty working at a regular full-time job on a continuing basis, she wrote: "Ben's depression is very closely tied to his physical health. He has difficulty doing tasks for extended periods of time, stress[?] exacerbates his pain [illegible] and impairs him from working efficiently and productively."  (R. 1162).  She predicted that Plaintiff would miss more than three days of work per month.  (*Id.*).  She indicated that Plaintiff does not have ongoing treatment that diminishes his symptoms and explained that "Ben is on meds and sees me monthly Q6 [weeks] but continues to be symptomatic [because] his GI problems are chronic and directly affects his mental health."  (R. 1163).  She further noted that Plaintiff demonstrates "marginal adjustment" and is able to make "minimal changes."  (*Id.*).

### B.    Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated January 28, 2020, Plaintiff stated that his pain causes often him to become short-tempered or mistake-prone and makes it difficult or impossible to concentrate or do anything other than rest. (R. 219).  His pain also makes it difficult for him to fall asleep.  (R. 221). His symptoms make him stop whatever he is doing to use the restroom, thereby making it difficult to complete tasks. (R. 219).  He spends his days using the computer after completing unspecified "tasks."  (R. 220).

He cares for two dogs with some assistance from his parents, with whom he lives.  (*Id.*).  He has no difficulties with personal care.  (*Id.*).  He sometimes requires reminders to care for minor health issues.  (*Id.*).  Plaintiff prepares simple meals for himself.  (R. 221).  He also vacuums, dusts, mows the lawn, shovels snow, takes out the trash and does small repairs and yardwork, although he often requires encouragement or breaks because of his symptoms.  (*Id.*).  He goes outside every day, if only for a limited amount of time.  (R. 222).  He is able to walk, drive and use public transportation alone, shop online and in stores, and manage money.  (*Id.*).  Plaintiff's hobbies include playing video games, reading, "learning how things work," making models, painting and using the internet.  (R. 223).  He goes to dinner or the movies or engages in a similar activity two to three times per week with his family but does not socialize with friends.  (R. 223-24).  Plaintiff checked boxes on the form indicating difficulties with completing tasks and concentration.  (R. 224).  He can walk "several miles" and usually pay attention for three to four hours, but only 30 minutes if has pain or has to use the restroom.  (*Id.*).  He can generally follow instructions unless distracted by pain, handle low levels of stress, and adjust to new routines if given time.  (R. 225).

At the March 25, 2021 administrative hearing, Plaintiff testified that he lives with his parents in their house.  (R. 54).  He has a driver's license and drives most days.  (R. 51).  Plaintiff stopped attending high school in eleventh grade due to his worsening symptoms and then had a home tutor.  (R. 51, 68).  He testified that he subsequently switched to community college classes to obtain a high school diploma.  (*Id.*).  He reported missing class regularly due to his symptoms, even after they switched from in-person to remote.  (R. 67-68).  He explained that he last worked for pay as a Door Dash driver until March 2020 but stopped due to Covid-19 because he is "somewhat immunocompromised."  (R. 52).  He then received Pandemic

Unemployment Assistance, for which he certified that he was ready, willing, and able to work, although he testified that this was a reference only to his limited Door Dash work.  (R. 69).

Since the summer of 2020 he has volunteered twice a week doing odd jobs at an aviation museum but "somewhat regularly" arrives late or leaves early, takes breaks, and misses approximately half of his scheduled time due to symptoms of his Crohn's disease, including pain, nausea or having to go to the restroom.  (R. 55-56, 59).  He described his pain as "daily and constant," varying between two and eight on a one-to-ten scale and somewhere between three and five most days.  (R. 58-59, 70-71).  The pain makes it difficult to concentrate or complete simple tasks.  (R. 58).  He also experiences abdominal "churning" during which he cannot tell if has to use the restroom or only has gas.  (R. 60).  This churning requires him to visit the restroom upwards of four or five times per day to avoid accidents.  (*Id.*).  Plaintiff normally spends 20 to 30 minutes in the restroom at a time and uses a bidet because he also suffers from anal fissures approximately half the time.  (*Id.*).  He must apply topical products.  (R. 61).  Because of Plaintiff's conditions, he is most comfortable sitting or lying down and normally lies down for an hour or two in the afternoon.  (R. 62).

He uses prescribed medical marijuana "daily as needed" for pain management and assistance sleeping.  (R. 55-56).  The initial prescribing physician, Dr. Jangro, later wanted to prescribe Plaintiff something else because his improvement on medical marijuana had plateaued.  (R. 57).  Plaintiff stopped using medical marijuana for a few weeks, and tried versions without THC, but his symptoms allegedly worsened.  (R. 63-65).  He then sought a second opinion from Dr. DelBusto and began treating with her instead.  (R. 57, 63).  He reported using less medical marijuana with Dr. DelBusto than originally with Dr. Jangro.  (R. 63).  Plaintiff testified that Dr. DelBusto believes the medical marijuana has been effective in treating his symptoms and that she continues to prescribe it.  (R. 65).

12

Plaintiff also suffers from depression "pretty regularly" and anxiety "fairly regularly" or three to four times per week. (R. 66). Additionally, he experiences anger, agitation and irritability if he has a few consecutive bad days of symptoms. (R. 66-67). He only socializes with family members and lost most of his friends after leaving high school. (R. 71). He plays video games online with strangers and occasionally posts to Reddit. (R. 72).


III.    ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.    The claimant has not engaged in substantial gainful activity since November 28, 2019, the application date.

2.    The claimant has the following severe impairments: inflammatory bowel disorder [IBD or IBS], depressive disorder, and anxiety disorder.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) except he can occasionally balance, stoop, crouch, and climb ramps and stairs. He can never kneel, crawl, or climb ladders, ropes, or scaffolds. He must avoid frequent exposure to extreme cold, extreme heat, humidity, and hazards including moving machinery and unprotected heights. He can perform unskilled work with routine and repetitive tasks requiring no more than normal breaks, no frequent changes in the work setting, no public interaction, and no

13

more than occasional interaction with co-workers and supervisors.

5.     The claimant has no past relevant work.

6.     The claimant was born on November 6, 1998 and was 21 years old, which is

defined as a younger individual age 18-44, on the date the application was filed.

7.     The claimant has a limited education.

8.     Transferability of job skills is not an issue because the claimant does not have past

relevant work.

9.     Considering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security

Act, since November 28, 2019, the date the application was filed.

(R. 19-34).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 35).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that she cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If she is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits her physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the

14

> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform her past work.  If the
> claimant cannot perform her past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

   Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a

reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118

(3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the

decision of the ALJ will not be overruled as long as there is substantial evidence to support it.

*Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal

issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

V.      **DISCUSSION**

In his request for review, Plaintiff raises four claims:[2]

> 1. The ALJ erroneously rejected the opinions of the treating physicians.

> 2. The ALJ erred by finding Plaintiff could function to a greater degree than he alleged due to activities of daily living.

> 3. Because the ALJ disregarded the critical evidence, she overstated Plaintiff's RFC, and failed to provide a meaningful explanation for omitting any off task limitation.

> 4. The ALJ failed to include all of Plaintiff's credibly established limitations in her hypothetical question to the vocational expert.

(Pl.'s Br., ECF No. 10, at 4-26).

A.      **Treating Physician Opinions**

The Commissioner modified Social Security's regulations in 2017, changing the way ALJs evaluate medical evidence. The prior regulations, governing claims filed before March 27, 2017, divided medical sources into three categories: treating, examining, and non-examining. *See* 20 C.F.R. § 404.1527(c). ALJs were to weigh each medical opinion and could sometimes afford controlling weight to opinions from treating sources. *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion. *See id.* § 404.1520c(a). Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding. *See id.* Five factors determine persuasiveness: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the

---

[2] The Court sets forth and considers Plaintiff's arguments in the order corresponding to the five-step sequential analysis.

claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c). Supportability and consistency are the most important factors. *Id.* § 404.1520c(b)(2). ALJs need not explain their determinations regarding the other factors, but they must discuss supportability and consistency. *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

Here, Plaintiff contends that the ALJ misapplied § 404.1520c and erroneously rejected the opinions of Plaintiff's treating gastroenterologist and psychiatrist, Drs. Kaufman and DelBusto.

### 1.    Dr. Kaufman

Regarding Dr. Kaufman's opinion, the ALJ wrote:

> Dr. Kaufman opined in March 2021 that the claimant requires a job that permits ready access to a restroom. He opined the claimant would require unscheduled multiple restroom breaks during a working day for 30-60 minutes. Dr. Kaufman opined the claimant would need to lie down at unpredictable intervals during a working day. He opined the claimant's impairments would likely produce "good days" and "bad days." Dr. Kaufman opined the claimant would miss more than 4 days of work per month (12F). However, Dr. Kaufman's opinion is not consistent with the medical evidence and other evidence of record.

17

For instance, the medical evidence of record documents several emergency department visits due to gastrointestinal issues, including symptoms of nausea, vomiting, and abdominal cramping. The claimant routinely appeared afebrile and hemodynamically stable following treatment (14F/5-11, 13-27, 29-36). The claimant's treatment regimen has included regular Remicade infusions resulting in stabilization of his symptoms (3F; 5F). In March 2020, [t]he claimant reported himself as "alright" symptomatically from a gastrointestinal perspective. He rated his pain as a 1-2/10 level, mostly in the mid-abdomen upper or lower. The claimant described his bowel habits as stable with intermittent diarrhea generally resolving on its own. He denied bleeding, urgency, or nocturnal symptoms. On examination, the claimant exhibited soft, minimal diffuse tenderness without localization. However, the claimant also exhibited normoactive bowel sounds, no rebound or guarding, and no hepatosplenomegaly (5F/10-15). In February 2021, He demonstrated no abdominal tenderness and no distension. The claimant exhibited a flat, soft abdomen with no mass (14F/1-4). Therefore, I find Dr. Kaufman's opinion unpersuasive.

(R. 32).

### a.    The Parties' Positions

Plaintiff observes that, as confirmed by the VE, if the ALJ had credited Dr. Kaufman's opinion including his conclusion that Plaintiff would miss more than four workdays monthly, he would be unable to maintain regular employment, compelling a finding that he is disabled. (Pl.'s Br., ECF No. 10, at 6-7 (citing R. 74-75)). He asserts that the ALJ decision failed to consider the supportability of Dr. Kaufman's opinion as required by § 404.1520c and that, if she had done so, she would have seen that Dr. Kaufman's treatment records support his opinion. (*Id.* at 8 (citing R. 391, 405, 636, 662-63)). He further contends that the ALJ incorrectly determined that Dr. Kaufman's opinion was not consistent with the record evidence based only on a single visit to Dr. Kaufman and one portion of a routine examination by his family doctor, while disregarding the rest of his treatment at Main Line Gastroenterology, his multiple ER visits and his hearing testimony. (*Id.* at 8, 12 (citing R. 55, 59-61, 390-468, 499-560, 634-61, 960-66, 968-81, 984-91,

1038-43)).  Plaintiff notes that an ALJ must provide a reason for rejecting relevant evidence and cannot cherry-pick evidence.  (*Id.* at 11-13 (citations omitted)).  He disputes that he was "stable" with Remicade infusions, highlights that in any event the regulations acknowledge that symptoms of Crohn's disease normally fluctuate and points out that his lack of a fever or circulation issues at his ER visits does not lessen the severity of his Crohn's disease.  (*Id.* at 11-12 (citing 20 C.F.R. § Pt. 404, Subpt. P,  App. 1, 5.00(E)(1)) (additional citations omitted)).

The Acting Commissioner responds that the ALJ did not have to use "magic words" in addressing the supportability of Dr. Kaufman's opinion.  (Resp., ECF No. 11, at 8 (citation omitted)).  She posits that, considering the whole of the decision, the ALJ considered the supportability by summarizing the evidence from Dr. Kaufman, by identifying other medical evidence that was "not consistent" with it and by explaining how it was not supported by Dr. Kaufman's treatment notes from a March 2020 visit.  (*Id.* at 9).  She disputes that the ALJ failed to consider whether the remaining evidence from Dr. Kaufman supported his opinion, citing the ALJ's summary of it earlier in the decision.  (*Id.* at 10).  She claims that the ALJ's decision permits the Court "to trace the path of her reasoning" and accuses Plaintiff of seeking to have the evidence reweighed.  (*Id.*).

The Acting Commissioner maintains that the ALJ's reference to Dr. Kaufman's opinion being "not consistent" with the other evidence, when coupled with her discussion of that evidence, also fulfills the requirement to explain consistency.  (*Id.* at 11-12).  The Acting Commissioner highlights the evidence cited by the ALJ, including notes from the March 2020 visit; that Plaintiff experienced some relief from Remicade injections; that Plaintiff did not have a fever and had normal circulation during his ER visits; and that a February 2021 physical examination showed unremarkable results.  (*Id.* at 11-12 (citing R. 509, 510, 958, 962-63, 965)).  Further, she contends that the ALJ addressed the consistency of Dr. Kaufman's opinion by

evaluating the persuasiveness of the medical administrative findings.  (*Id.* at 13 (citing R. 31-32, 94-98)).

Plaintiff replies that the Acting Commissioner conflates supportability with consistency, as evidenced by her argument that the ALJ addressed the former by discussing the latter.  (Reply, ECF No. 12, at 7).  He contends that that the ALJ and Acting Commissioner unduly fixated on the March 2020 visit, each citing it four times while almost completely ignoring the remainder of the evidence.  (*Id.* at 2).  Plaintiff observes that this remaining evidence includes "extensive upper, small bowel, and colonic Crohn's disease, complicated by overlap IBS and significant chronic pain," "nausea, vomiting, abdominal cramping, and lightheadedness," periodic exacerbations of these conditions as evidenced by the multiple ER visits, and Plaintiff's sworn hearing testimony.  (*Id.* at 2-3, 5 (citing R. 390-468, 499-560, 634-61, 960-66, 968-81, 984-91, 1038-43)).  Citing the federal regulations and circuit-level case law, he contends that by seizing upon a single instance in which his symptoms had temporarily dissipated, the ALJ ignored the on-again-off-again nature of IBS.  (*Id.* at 3-4, 10 (citing *Sales v. Apfel*, 188 F.3d 982 (8th Cir. 1999))).  He maintains that it is obvious that an individual who requires unscheduled 20-minute to one-hour bathroom breaks four or more times per day, as well as unscheduled rest breaks to lie down, will be off-task for a significant portion of the workday.  (*Id.* at 4).  He denies that he is requesting the Court to reweigh the evidence but insists that he has a right to have the supportability of Dr. Kaufman's opinion considered in the decision, as set forth in 20 C.F.R. § 404.1520c(c)(1).  (*Id.* at 8).

### b.     Analysis

An ALJ must "explain" how he or she considered both supportability and consistency.  20 C.F.R. § 404.1520c(b)(1), (c)(1)-(2).  Yet, on its face, the ALJ's decision makes no mention of the supportability of Dr. Kaufman's opinion.  (R. 17-35).  Citing *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Acting Commissioner observes that no magic words referencing the factor is

required.  *See id.* at 505 (holding that no "particular language" was required in setting forth conclusion that the plaintiff's conditions did not meet a listing at step three).  She submits that the ALJ addressed the opinion's supportability in three ways.[3]

First, she posits that the ALJ fulfilled her duties regarding this factor simply by summarizing Dr. Kaufman's treatment notes.  (Resp., ECF No. 11, at 9-10).  But a simple factual recitation of this evidence lacks the requisite analysis of whether the notes support the conclusions reached by Dr. Kaufman.  (*See* R. 26-28).

Second, the Acting Commissioner claims that the ALJ examined supportability by examining consistency.  (Resp., ECF No. 11, at 9).  Supportability and consistency are different factors, separately enumerated and addressed within the regulations.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).  A key difference between them is that supportability considers the evidence and explanations "presented be a medical source," whereas consistency looks at "evidence from *other* medical sources and nonmedical sources in the claim . . . ."  *Id.* (emphasis added).  Thus, an ALJ does not address the support provided by a medical source for his or her opinion by articulating the consistency of the opinion with the evidence from other sources.

Third, the Acting Commissioner insists that the ALJ considered supportability by parsing the treatment notes from a March 2020 visit in which Plaintiff reported to Dr. Kaufman that his gastrointestinal symptoms were "alright," with limited pain, stable bowel habits and only intermittent diarrhea resolving on its own.  (Resp., ECF No. 11, at 9).  However, this focus on a

---

[3]  In a footnote, the Acting Commissioner also suggests that Dr. Kaufman insufficiently supported his opinion by primarily providing "fill-in-the-blank answers."  (Resp., ECF No. 11, at 10 n. 7).  However, in rejecting the opinion, the ALJ did not cite this reason, which has instead been improperly provided after-the-fact by the Acting Commissioner.  *See Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision; the Commissioner may not offer a post-hoc rationalization.") (internal quotations omitted).

single visit to the exclusion of other Dr. Kaufman treatment notes showing significantly worse symptoms disregards the fluctuating severity of Crohn's disease and IBD symptoms, as acknowledged in the regulations themselves.  20 C.F.R. § Pt. 404, Subpt. P,  App. 1, 5.00(E)(1) ("Remissions and exacerbations of variable duration are the hallmark of IBD."); *see also Sales*, 188 F.3d at 983 ("[Crohn's] disease is characterized by periods of remission and recurrence following treatment.") (citing *Dix v. Sullivan*, 900 F.2d 135, 136 (8th Cir. 1990)).  Particularly in light of the recurring nature of Plaintiff's condition, it was inappropriate for the ALJ to cherry-pick one visit in which his symptoms had temporarily subsided and thereby conclude that Dr. Kaufman's opinion was not supported by his own records.  *See Piper v. Saul*, No. 2:18-1450, 2020 WL 709517, at *4 (W.D. Pa. Feb. 12, 2020) ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings."); *Fanelli v. Colvin*, No. 3:16-CV-1060, 2017 WL 551907, at *9 (M.D. Pa. Feb. 10, 2017) ("[An] evaluation[ ] where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence  that points another way, amounts to a 'cherry-picking' of the record which this Court will not abide."); *Griffith v. Astrue*, 839 F. Supp. 2d 771, 783 (D. Del. 2012) ("Plaintiff correctly argues that an ALJ is not permitted to 'cherry-pick' only that that evidence that supports her position.").

Regarding the consistency factor, the ALJ wrote that "Dr. Kaufman's opinion is not consistent with the medical evidence and other evidence of record."  (R. 32).  Initially, to the extent that the ALJ relied upon the cherry-picked treatment notes from Plaintiff's March 2020 visit with Dr. Kaufman to address this factor as well, these notes are more properly considered under supportability, which, in contrast to consistency, looks at medical evidence "presented by" the opining source.  20 C.F.R. § 404.1520c(c)(1).  Further, the ALJ's separate discussion of Dr. Parmelee's administrative findings did not fulfill her duties under § 404.1520c(c)(2), which

requires not just acknowledgment of the other medical evidence but also consideration of how the evidence is or is not consistent with the opinion at issue.  Here, the ALJ's evaluation of Dr. Kaufman's opinion makes no reference to Dr. Parmelee's findings.  (R. 32).

Moreover, the evidence cited by the ALJ does not support her determination that Dr. Kaufman's opinion is "not consistent" with the remainder of the record.  The ALJ, and the Acting Commissioner in turn, fails to explain how Dr. Kaufman's opinion regarding the limiting effects of Plaintiff's Crohn's disease is inconsistent with stable blood pressure and lack of a fever at ER visits or his normal results from a routine physical examination.  (*See* R. 32 (citing R. 956-66); *see also* Resp., ECF No. 11, at 11-13).  In addition, the ALJ alleges that Plaintiff had "stabilization of his symptoms" with Remicade infusions, (*see* R. 32), but ignores the fact that Plaintiff nonetheless had to seek emergency treatment notwithstanding the infusions.  (*See, e.g.,* R. 960-66, 968-781, 985-91).  At these visits, Plaintiff continued to exhibit symptoms of his Crohn's disease, including nausea, vomiting, abdominal pain and intermittent cramping. (R. 960, 968, 973, 975-76. 981, 983-86).  During this period, he also suffered from weight loss, anal fissures and abdominal pain and vomiting not requiring emergency treatment.  (R. 402, 405, 636).

Plaintiff's issue with the ALJ's treatment of Dr. Kaufman's opinion is not, as the Acting Commissioner attempts to frame it, that the ALJ did not provide a written analysis of how she "considered each piece of evidence."  (Resp., ECF No. 10, at 10 (quoting 82 Fed. Reg. 5844-01, at 5858)).  It is that the ALJ did not properly address the supportability and consistency of the opinion as required by 20 C.F.R. § 404.1520c(c)(1)-(2).  In light of this failure, the Court remands this matter for a proper evaluation of those factors.

### 2.    Dr. DelBusto

Regarding Dr. DelBusto's opinion, the ALJ wrote:

Dr. Elena DelBusto opined in March 2021 that the claimant has no

23

useful ability to function in making simple work-related decisions and completing a normal workday and workweek without interruptions from psychologically based symptoms. She opined the claimant is unable to meet competitive standards in maintaining regular attendance and punctuality within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; and working in coordination with or proximity to others without being unduly distracted. Dr. DelBusto opined the claimant is unable to meet competitive standards in performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; and dealing with normal work stress. She opined the claimant is seriously limited in maintaining attention for a 2-hour segment. Dr. DelBusto opined the claimant is limited but has a satisfactory ability to remember work-like procedures, ask simple questions or request assistance, or accept instructions and respond appropriately to criticism from supervisors (15F).

For instance, the claimant exhibited cooperative behavior, responsiveness, adequate social skills, normal posture, and normal motor behavior during the consultative mental status examination. He demonstrated intelligible and fluent speech. The claimant exhibited clear voice quality. He demonstrated adequately developed expressive and receptive language skills. The claimant exhibited coherent and goal-directed thought processes. He demonstrated normal thought content and perceptions. The claimant denied suicidal or homicidal ideation. He demonstrated a clear sensorium and orientation to person, place, and time. The claimant exhibited intact recent and remote memory skills. He demonstrated intact cognitive functioning and an appropriate general fund of information. The claimant exhibited fair insight and good judgment (7F). Throughout the relevant period, the claimant consistently exhibited a normal mood, normal affect, cooperative behavior, normal attention, normal perceptions, alertness, and orientation to person, place, and time (14F/1-11, 21-27, 29-36). Such evidence supports significantly lesser mental limitations. Therefore, I find Dr. DelBusto's opinion unpersuasive.

(R. 32-33).

### a.    The Parties' Positions

Plaintiff points out that the VE also agreed that the limitations proffered by Dr. DelBusto, if accepted by the ALJ, would have been work-preclusive.  (Pl.'s Br., ECF No. 10, at 15 (citing R. 74-75)).  He asserts that the ALJ failed to address both the supportability and consistency of her

opinion.  (*Id.* at 18-20).  He maintains that if the ALJ had considered the support for her opinion offered by Dr. DelBusto, including that Plaintiff's mental health problems are "closely tied" and "directly" affected by his underlying gastrointestinal problems, she would have found the opinion persuasive.  (*Id.* at 18 (citing R. 1162-63)).  Similarly, he contends that if the ALJ had considered consistency, she would have determined that Dr. DelBusto's opinions comported with the other medical evidence in the record, including: (1) a consultative examination finding that he suffers from difficulty sleeping, nightmares, anxiety, depressed mood, hopelessness, past suicidal ideation without a plan, irritability, restlessness, tension, inability to concentrate and panic attacks with nausea, hyperventilation, agitation, and racing thoughts; and (2) a letter from a mental health treatment provider recounting similar symptoms and explaining that because of his physical condition he dropped out of high school, and later community college, and lost his friends.  (*Id.* at 19-20 (citing R. 601-02)).

Plaintiff further observes that in rejecting Dr. DelBusto's opinion the ALJ relied exclusively on the results of mental status examinations, which he notes may not accurately measure social limitations and in any event are only one of 12 different types of medical evidence to be considered under the regulations.  (*Id.* at 16-17 (citing 20 C.F.R. § Pt. 404, Subpt. P,  App. 1, 12.00C(2) (additional citations omitted))).  Additionally, he cites a regulation cautioning against extrapolating an ability to function at work from an individual's presentation in a therapeutic setting.  (*Id.* at 17 (citing 20 C.F.R. § Pt. 404, Subpt. P,  App. 1, 12.00F(3)(C))).

Regarding supportability, the Acting Commissioner responds with essentially the same arguments she made regarding Dr. Kaufman's opinion, including that the ALJ was not required to use any particular language, that the ALJ considered this factor when she summarized Dr. DelBusto's opinion and cited inconsistent medical evidence from other providers, that Plaintiff merely seeks to have the evidence analyzed piece-by-piece and reweighed and that Dr. DelBusto

insufficiently supported her opinion.  (Resp., ECF No. 11, at 8-10 & n.7 (citing R. 33)).  As for

consistency, she notes that the ALJ cited the unremarkable results from Plaintiff's consultative

and ER mental health examinations and that, earlier in the decision, the ALJ concluded that

Plaintiff received only routine and conservative treatment for his mental health issues.  (*Id.* at 12).

She also argues that the ALJ addressed the consistency of Dr. DelBusto's opinion by evaluating

the persuasiveness of Dr. Cloutier's administrative findings.  (*Id.* at 13 (citing R. 31)).

In reply, Plaintiff reiterates that the ALJ addressed neither the supportability nor

consistency of Dr. DelBusto's opinion and again denies that he seeks to have the evidence

reweighed.  (Reply, ECF No. 7, at 7-8).  He asserts that Dr. DelBusto supported her opinion by

explaining that Plaintiff's depression is strongly associated with his medical problems and that

his inability to stick with tasks exacerbates his pain and impedes his ability to work efficiently or

productively, despite his ongoing treatment.  (*Id.* at 8 (citing R. 1162-63)).

**b.      Analysis**

The ALJ's decision is devoid of any reference to supportability or consistency.  Indeed, it

is clear that the ALJ did not address supportability because, notwithstanding her summary of Dr.

DelBusto's opinion, she disregarded the explanation offered by Dr. DelBusto for it, as well as the

depression and anxiety questionnaires Plaintiff completed under Dr. DelBusto's care.  (*See* R.

470-73, 604-06, 609); 20 C.F.R. § 404.1520c(c)(1) (supportability requires consideration of

evidence "presented by" the opining source).  Instead, in her evaluation of the persuasiveness of

the opinion she relied wholly on evidence from other sources, which is more appropriate for a

consistency analysis.  (R. 33 (citing R. 586-99, 956-66, 976-82, 984-91)); *see also* 20 C.F.R.

§ 404.1520c(c)(2) (noting that such evidence is considered under consistency).  Although the

ALJ was not required to use any "magic words" in her analysis, a simple summary of an opinion

does not fulfill the regulatory requirement to "explain how" supportability was considered.  *See*

20 C.F.R. § 404.1520c(b)(2).

The ALJ also did not explicitly address consistency.  Nonetheless, the Acting Commissioner maintains that the ALJ considered this factor when she separately evaluated the persuasiveness of the psychological administrative findings.  However, § 404.1520c(b)(2) requires the ALJ to *explain* why an opinion is consistent or not consistent, not simply summarize the other evidence in the record and let the reader decide whether the opinion is consistent with it.  *See* 82 Fed. Reg. 5844-01 at 5858 (a reviewing court must be able "to trace the path of an adjudicator's reasoning").  Further, the Acting Commissioner's claim that "[e]lsewhere" in the decision the ALJ reasoned that Plaintiff received only limited and conservative mental health treatment, which reason was *not* proffered by the ALJ as a basis for discounting Dr. DelBusto's opinion, (*see* R. 32-33), is nothing more than an improper post-hoc rationalization.  *See Schuster*, 879 F. Supp. 2d at 466.

Finally, the Acting Commissioner points to the ALJ's determination that the results of Plaintiff's consultative and ER mental health examinations do not support Dr. DelBusto's opinion.  (*See* R. 33).  But many of the consultative examination results, in particular, seemingly bear little or no connection to Dr. DelBusto's finding of disabling depression stemming from Plaintiff's underlying physical problems, and the ALJ fails to "explain how" any of the results are inconsistent with the opinion.  (R. 33 (noting cooperative behavior, responsiveness, adequate social skills, normal posture and motor behavior, intelligible and fluent speech, clear voice, excessive and receptive language skills, coherent and goal-directed thought processes, normal though content and perceptions, no suicidal or homicidal ideation, clear sensorium, full orientation, intact memory skills, appropriate information fund, fair insight, and good judgment)); *see also* 20 C.F.R. § 404.1520c(b)(2).  Further, even this discussion of Plaintiff's consultative examination omits several key findings regarding his "current functioning."  (*See id.*

27

(omitting findings regarding Plaintiff's difficulty falling asleep, nightmares, anxiety, depressed mood, hopelessness, past suicidal ideation, irritability, tense feelings, panic attacks, hyperventilation, agitation and racing thoughts); *see also* R. 587-89).

As for Plaintiff's ER records showing normal mood and affect, these snapshots stemming from flare ups of his Crohn's disease do not, as the ALJ puts it, necessarily reflect Plaintiff's mental condition "[t]hroughout the relevant period," (*see* R. 33), especially where the ALJ did not evaluate the consistency of Dr. DelBusto's opinion with additional mental health records such as Plaintiff's group therapy notes, the treatment summary letter from Poppel or psychotherapy progress notes (let alone, as part of the supportability analysis, the depression and anxiety questionnaires completed by Plaintiff while under Dr. DelBusto's care).  (*See* R. 285-334 (group therapy notes reflecting depression, anxiety, anger and irritability), 600-02 (provider letter noting angry affect, depressed mood, social withdrawal and lack of motivation), 614-32 (psychotherapy progress notes reflecting symptoms of depression and anxiety); *see also* R. 33, 469-98 (Dr. DelBusto progress notes and "depression inventories" reflecting generally "moderate" levels of depression)).  If the ALJ had considered the consistency of Dr. DelBusto's opinion with these records from other sources, she may have reached a different conclusion about the opinion's persuasiveness.  Because the ALJ instead selectively highlighted only those records tending to support her determination, the consistency analysis is flawed as well.  *See Piper*, 2020 WL 709517 (prohibiting cherry-picking favorable evidence while ignoring contrary evidence); *Fanelli*, 2017 WL 551907, at *9 (same); *Griffith*, 839 F. Supp. 2d at 783 (same). Accordingly, the Court remands for the ALJ to consider the supportability and consistency of Dr. DelBusto's opinion pursuant to 20 C.F.R. § 404.1520c(c)(1)-(2).

    **B.**    **ADLs**

Regarding Plaintiff's ADLs, the ALJ wrote:

The claimant's testimony and reports of daily activities also do not clearly support a finding that his functioning is reduced below the level indicated in the residual functional capacity set forth above. For instance, the claimant reported taking care of two dogs with the assistance of his parents. He reported no problems with performing personal care, including dressing, bathing, and grooming. The claimant reported preparing simple meals and performing a range of household chores such as vacuuming, mowing the lawn, and moving trash. He reported the ability to walk several miles before needing to stop and rest. The claimant reported getting around by walking and driving a car. He reported shopping in stores and by computer. The claimant reported paying bills, counting change, handling a savings account, and using a checkbook. He reported playing video games, reading history books, making models, painting, and using a computer. The claimant reported occasionally going to dinner or a movie with his parents. He reported the ability to pay attention for 3-4 hours but having interruptions at times due to gastrointestinal issues. The claimant reported the ability to follow written instructions. He reported getting along with authority figures. He reported volunteering regularly at a local aviation museum, watching birds, and making model airplanes. The claimant reported playing video games, reading history and science articles, reading fiction and self-help books, and getting along with his parents fairly well (4E; 7F; Hearing Testimony). All these activities indicate the claimant has the continued ability to function at a greater degree than he alleges.

(R. 29-30).

Plaintiff asserts that the ALJ again disregards the fluctuating severity of Crohn's disease and maintains that Plaintiff was able to carry out the above ADLs only during periods of decreased severity. (Pl.'s Br., ECF No. 10, at 24-25). He points out that even with his symptoms sometimes dissipating he has been unable to live a normal life and that his volunteer work, in particular, has been characterized by frequent absences, early departures and late arrivals because of his condition, notwithstanding his already having a limited schedule. (*Id.* at 25). The Acting Commissioner responds that the ALJ is required to consider a claimant's ADLs, among other things, when assessing his or her subjective complaints and that an ALJ's determination is entitled to great deference if supported by substantial evidence. (Resp., ECF No. 11, at 18

(citations omitted)).  She observes that the ALJ did *not* find that Plaintiff's ADLs alone indicated that he could work within the parameters of the RFC or for an eight-hour workday but instead considered them only as one factor among several in evaluating whether Plaintiff's limitations were as severe as he alleged.  (*Id.* at 18-19).  Plaintiff's reply largely repeats the arguments made in his opening brief: that the ALJ ignored the recurring nature of Crohn's disease; that he carried out the cited ADLs only during periods of relative remission of his condition; and that even during these times he struggled to complete these ADLs, as reflected in his inability to keep up with even a minimal volunteer schedule.  (Reply, ECF No. 12, at 6).  To these arguments, Plaintiff adds that ADLs such as his "cannot alone be used to show ability to engage in substantial gainful activity."  (*Id.* at 6-7 (citations omitted)).

A close reading of the ALJ's decision confirms that she considered Plaintiff's ADLs only for the specific purpose of assessing Plaintiff's subjective complaints, not as the sole basis to establish his RFC or to declare him "not disabled."  The ALJ finished her discussion of Plaintiff's ADLs with the limited conclusion drawn from her consideration of them: "All these activities indicate the claimant has the continued ability to function at a greater degree *than he alleges*."[4]  (R. 29-30) (emphasis added).  The consideration of Plaintiff's ADLs as one factor among several in evaluating Plaintiff's subjective complaints was in keeping with the regulations.  *See* 20 C.F.R. § 416.929(c)(3)(i) (listing "[y]our daily activities" as one of seven "factors relevant to your symptoms, such as pain, which we will consider"); *see also* 16-3p, 2016 WL 1119029(d)(1) (Mar. 16, 2016) (listing "[d]aily activities" as one of the seven factors to evaluate the intensity, persistence, and limiting effects of an individual's symptoms).  Thus, the

---

[4]  Plaintiff omits the first sentence from his block quote of this paragraph.  (Pl.'s Br., ECF No. 10, at 24).

ALJ could properly find that Plaintiff's ADLs were not in line with his subjective complaints, without necessarily finding that the ADLs demonstrated that Plaintiff leads, in his words, "a normal life" or that they alone demonstrate his ability to work full-time.  The question is whether the ALJ's determination that Plaintiff's subjective complaints were not supported by his ADLs is supported by substantial evidence.  Here, as set forth in the block quote above, the ALJ supported her decision by recounting Plaintiff's hearing testimony describing his ADLs, including pet care, personal care, simple meal preparation, vacuuming, mowing, taking out trash, walking up to several miles, driving, shopping in person and online, managing money, playing video games, reading, making models, painting, using a computer, occasional going to dinner or the movies and volunteer work, albeit on a limited and often interrupted basis.  (R. 29-30). Accordingly, this Court "cannot say that this is the extraordinary case that merits reversal of a ALJ's credibility determination."  *Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 189 (3d Cir. 2007).  Plaintiff's request for remand on the proffered basis is denied.

### C.      Plaintiff's Remaining Arguments

In addition, Plaintiff contends that the ALJ's failure to appropriately evaluate the evidence, including Dr. Kaufman's opinion, resulted in an "overstated" RFC at step four, without a meaningful explanation for the omission of an "off task" limitation.  (Pl.'s Br., ECF No. 10, at 21-23; Reply, ECF No. 12, at 5-6).  He further argues that at step five the ALJ failed to include all his credibly established limitations in the hypothetical to the vocational expert.  (Pl.'s Br., ECF No. 10, at 25-26).  However, the Court need not decide whether these issues—which would be addressed later in the five-step analysis—constitute a basis for remand.  If the ALJ determines on remand that proper consideration of the opinions of Drs. Kaufman and DelBusto warrants a more restrictive RFC, Plaintiff's claim of an "overstated" RFC may fade away, as may his claim that the hypothetical flowing from that RFC fails to include all credibly established limitations.

31

*See Steinninger v. Barnhart*, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ may reverse his or her findings after remand).  Accordingly, the Court does not consider these additional arguments at this time.


**VI.      CONCLUSION**

For the reasons set forth above, Plaintiff's request for review is **GRANTED** to the extent that it requests remand.  This matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge